IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL EDDIE BLAND II,

          Petitioner,

v.

ROBERT HOREL,

          Respondent.

NO. C07-4023 TEH

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Pro se Petitioner Paul Eddie Bland II, a prisoner currently incarcerated by the California Department of Corrections and Rehabilitation at Pelican Bay State Prison in Crescent City, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254. On November 18, 2008, this Court ordered Respondent Robert Horel to show cause as to why Petitioner's amended petition should not be granted. Respondent filed an answer on March 17, 2009, and Petitioner filed a traverse on July 20, 2009. Petitioner subsequently filed a request for an evidentiary hearing on October 13, 2009. After carefully reviewing the parties' written arguments, the record, and governing law, the Court now DENIES the petition for the reasons set forth below.

## I.   BACKGROUND

This case stems from Petitioner's conviction of murder in the second degree, with firearm enhancements, for the May 31, 2003 shooting death of Ronald Daniels. The California Court of Appeal summarized the facts as follows:

> I. The People's Case.
>
> Ronald Daniels and Paul Bland both sold drugs in a high-crime area of Richmond known as the "Iron Triangle." Eric Chambers was friends with both Daniels and Bland. Chambers wanted to testify at trial but acknowledged he had to be arrested in order to make that happen. He did not want Bland to get in trouble.

Chambers and Daniels sold drugs in the area of First and MacDonald Streets for at least six years. Because Bland had been hanging around Chambers, Bland started selling drugs in the same area about three months before he shot Daniels.

Daniels had a "problem" with Bland selling drugs in the area. A month or two weeks before Bland shot Daniels, Daniels verbally threatened Bland a couple of times and ordered Bland to leave the area. Neither Daniels nor Bland appeared to be armed at the time Daniels made these threats.

Before the shooting, Daniels had a conversation with Chambers about how he was upset Bland was selling drugs in that area. Daniels told Chambers that Bland could not sell drugs there. Chambers then told Bland he could not "come around no more" because Daniels "was tripping."

On May 30, 2003, Bland called Chambers to ask whether he could borrow some money for a hotel room. Chambers agreed to loan the money and told Bland to meet him at First and MacDonald Streets where Chambers was selling drugs that night. When Bland arrived, Chambers told Bland he would have to wait until Chambers made the money.

Bland arrived at First and MacDonald Streets carrying a large rifle (about two and a half feet long) in his pants. It was obvious to everyone there that Bland was carrying a big gun. Chambers saw the gun poking out from Bland's coat.

Chambers and Bland stood around smoking marijuana and drinking for about an hour. Daniels was also there, about 20 yards away. At some point, Chambers walked over to Daniels. Daniels was not carrying a gun, although Chambers had seen Daniels with a gun in the past. Daniels asked Chambers what Bland was doing there. Chambers told Daniels that Bland was just in the area to borrow money and that Bland had a right to be there. Daniels replied that Bland was not from around there and had to go. After several minutes, Daniels walked over to Bland. They quickly began arguing. The argument between Bland and Daniels went on and off – Daniels would argue with Chambers, walk away, and then resume the argument. There was nothing preventing Bland from shooting Daniels both immediately before and during the argument.

Daniels, who was unarmed, started chasing Bland around a parked car, telling Bland that Bland had to leave, that he was going to get rid of Bland himself, and that he was going to kill Bland. The men circled the car about six times, stopping periodically on opposite sides to catch their breath. Bland told Daniels to stop chasing him, and that he did not want any trouble. Chambers and another man told Daniels to stop the chase. Daniels kept chasing Bland. Bland then said, "I'm not about to keep running," but the chase continued. Then Daniels was on the same side of the car, about four feet away from Bland. It looked to Chambers like Daniels was trying to grab Bland. Bland stopped running, pulled out his rifle, and shot Daniels several times. Daniels collapsed to the ground where Bland kept shooting "a

lot" more times. The shooting was continuous; there was no break or interval in it. It was stipulated that the shooting took place between 12:15 a.m. and 12:16 a.m. on May 31, 2003.

Bland fled to the nearby residence of Chamber's [sic] girlfriend, Charlene Jackson. At around 12:30 a.m. or 1:00 a.m., Jackson and her mother saw Bland hiding in their storage shed, sweating. Bland tried unsuccessfully to conceal his large gun in his pants and coat. He told the women that Chambers had instructed him to hide there. Jackson called Chambers, who told her that Bland had just shot Daniels and that she should call the police.[FN1] Jackson called the police and told Bland to leave. He left. When the police interviewed Jackson that night, she told them Daniels and Bland "got into an argument yesterday."

> [FN1] Chambers testified he told Jackson, when she called, that he did not know what had happened. Chambers was impeached with preliminary hearing testimony that he told Jackson on the telephone that Bland had killed Daniels.

The police found no weapons on Daniels's body. Daniels suffered a total of 15 gunshot wounds. Four gunshots entered his front torso area, one of which perforated the aorta artery and alone could have killed him. Two gunshots were to his back, both of which hit his spinal cord. These six wounds alone would have rendered Daniels immobile and unconscious within seconds. There were also nine gunshots to the left side of Daniels's face. The facial wounds were clustered together, indicating very little or no movement by Daniels at the time they were inflicted. Powder burns around the facial wounds suggested that the gun was fired from within one to six inches of Daniels's head. Although the coroner could not determine which shots were fired first, he opined that the location of the shots was consistent with Daniels being shot six times in the body, causing him to fall immobile to the ground, and then being shot nine more times in the face at close range. The coroner opined that Daniels was still alive more than two to three minutes after all the shots were fired.

The police collected 14 expended .22-caliber shell casings near Daniels's body. A ballistics expert opined the casings were all fired from the same gun, and could have been fired from a .22-caliber Marlin rifle.

A police detective collected a security surveillance videotape from a market near the scene of the shooting. Based on the tape, the detective determined that the shooting took place during a ten-second period. The detective remembered seeing a car and three people on the videotape, but could not recall what the three people were doing. That portion of the videotape was damaged due to repeated viewing.

In a telephone interview with police after the shooting, Chambers said that the night before the shooting, Daniels and someone else had pulled a gun on Bland, and that Bland had returned the next evening to "retaliate." Chambers said that the night of the shooting, Daniels was chasing Bland and was "probably trying to take the gun from

3

1 [Bland]." He said that after circling the car several times, Bland said, "'I'm tired of running,' turned around and killed [Daniels.]."

On June 17, 2003, the police arrested Bland.

## II. The Defense Case.

Bland testified that on May 31, 2003, he was homeless and lived on the streets, in hotel rooms, and abandoned houses. He sold drugs to support himself, and he also used drugs while selling them. He had been selling drugs with Chambers in Richmond for two months before the shooting, usually about two blocks from First and MacDonald Streets. Daniels also sold drugs in this area.

At some point before May 31, Daniels asked Bland to sell drugs for him, but Bland refused. Daniels was upset. He began threatening Bland, calling him a "little punk," telling him he could not sell drugs in the area anymore, and threatening to beat him up. Then the threats became more violent – Daniels said he would kill Bland. The first death threat came about a week before the shooting. Despite these threats, Bland continued to sell drugs in the same location.

On the night before the shooting, Bland testified Daniels and two other men, Snotty and Tone, confronted Bland at his usual drug dealing spot and attempted to rob him. Daniels, Snotty and Tone thought Bland had a gun and wanted it. Daniels was armed at the time with a gun. He told Bland to "come here" and when Bland walked away, Daniels shot many times. Bland ran for his life.[FN2]

> [FN2] In his post-arrest interview, Bland stated that Tone, not Daniels, wielded the gun.

Immediately after this incident, Bland purchased a .22-caliber Marlin rifle with a sawed-off stock from a man on the street. Bland was scared and bought the gun to protect himself. He paid with two "dime" pieces of cocaine. Bland believed the rifle was a semiautomatic.[FN3] Bland agreed it was "kind of a scary looking gun." He took the gun to an abandoned house and made sure it was loaded.

> [FN3] A firearms expert testified a semiautomatic firearm can produce 5 shots per second, with the shooter squeezing the trigger once for every shot.

The next day, May 30, 2003, Bland called Chambers and told him about the incident with Daniels and his associates. Bland asked Chambers to talk to Daniels because Bland did not want to have any problems with Daniels. Bland did not want to call the police because he would be labeled a snitch and anybody would kill him.

At around 10 p.m. that night, Bland went to First and MacDonald Streets to borrow money from Chambers for a hotel room. Bland brought his rifle because he was afraid that if he ran into Daniels, Daniels would again try to shoot him. The rifle was sticking out of the front of Bland's waistband and went down his pants leg.

4

Daniels arrived at First and MacDonald about 10 minutes after Bland. Daniels approached Chambers and Bland. Bland walked away because he did not want any problems with Daniels. Daniels told Chambers that Bland did not belong there and "had to go." Chambers replied that Daniels did not own the block, that anybody could be there, and that Bland was there with Chambers. Bland stood about 35 feet away, watching. Daniels then approached Bland, calling him a "little punk, telling [Bland he] had to go." Daniels began chasing Bland around a parked car. After about three times around the car, Daniels threatened to take Bland's gun from him and shoot him with it. Bland said he did not want any trouble and asked Chambers to intervene. Bland was not angry, only afraid. He thought Daniels was going to hurt him. Bland did not remember saying he was tired of running, but he was tired and tired of Daniels threatening him.

After five or six times around the car, Daniels briefly stopped chasing Bland and Bland tried to walk away. Bland then saw Daniels run up behind him. Bland turned around and Daniels was about four feet away, reaching for Bland with one hand. Bland believed Daniels was going to take the gun and shoot him with it. Bland pulled the gun from his waistband, and fired. Bland "just kept on shooting. It happened so fast. I kept on shooting." He shot Daniels because he was scared, because he believed Daniels was going to take the gun away from him and shoot him with it, and because Bland could not run away with the large rifle in his pants (even though he had been able to run around the car five or six times without Daniels catching him). Bland knew Daniels was unarmed that night.

Bland admitted he continued to shoot Daniels even after he was on the ground. He admitted he shot Daniels more times in the face than in the body. He admitted shooting Daniels "too many" times. Bland also admitted Daniels was no longer a threat when he was on the ground, but Bland explained he was "scared. It happened so fast." Bland testified that Daniels was too close and Bland was too scared to either fire a warning shot or hit Daniels with the rifle.

After the shooting, Bland fled the scene, went to Charlene Jackson's house until Jackson and her mother asked him to leave, and, the next day, threw the gun off of the Bay Bridge.

Bland played for the jury the videotape of his police interview conducted on June 17, 2003. In the interview, Bland at first denied shooting Daniels for well over an hour. He admitted shooting Daniels, however, after police told him they had evidence connecting him to the shooting (such as fingerprints and the security surveillance videotape described ante). Bland told the police that for weeks before the shooting, every time Daniels saw Bland, Daniels told him to leave or else he was going to beat, rob and kill him. He told the police Daniels and his associates were going to kill him, but that he (Bland) did not want to kill Daniels. Bland said Daniels knew Bland had a gun that night, but that did not stop Daniels from chasing Bland; Daniels thought he was "invincible, he ain't scared of nothing." As Daniels was chasing Bland, Daniels was trying to take

5

> Bland's gun from him and was saying, "Fire on me right now, take your gun, I ain't scared of no gun." Bland admitted shooting Daniels "too many" times.

Resp. Ex. 9 at 2-8 (*People v. Bland*, Cal. Ct. App. decision, Case Nos. A106562 & A110234 (Jan. 30, 2006)).

On March 26, 2004, a jury in the California Superior Court for Contra Costa County found Petitioner guilty of murder in the second degree, in violation of California Penal Code section 187. The jury also found that Petitioner personally used a firearm and that he personally and intentionally discharged a firearm causing death, in violation of California Penal Code sections 12022.5(a) and 12022.53(d), respectively. On April 30, 2004, the trial court sentenced Petitioner to a prison term of forty years to life.

On January 30, 2006, the California Court of Appeal affirmed Petitioner's conviction and sentence and denied Petitioner's petition for a writ of habeas corpus. The California Supreme Court summarily denied review on May 10, 2006.

Petitioner filed his original petition for writ of habeas corpus in this Court on August 6, 2007. On February 26, 2008, the Court dismissed that petition with leave to amend because the petition presented both exhausted and unexhausted claims. Petitioner subsequently petitioned the California Supreme Court for habeas relief on his unexhausted claims. Following that court's summary denial of review on August 27, 2008, Petitioner filed an amended petition in this Court and moved to reopen this case on October 2, 2008. The amended petition contained only those claims that were included in the initial petition and decided by the state appellate courts in 2006; it did not include the claims that were included in Petitioner's 2008 petition to the California Supreme Court.

This Court granted Petitioner's motion to reopen the case and file an amended petition on November 18, 2008. The Court dismissed Petitioner's claim "challenging the reasoning of the Court of Appeal in denying Petitioner's claims before that court" because it "does not present an independent claim for habeas relief," but ordered Respondent to show cause as to the remaining claims. Nov. 18, 2008 Order at 2.

6

The Court has subject matter jurisdiction under 28 U.S.C. § 2254, and venue is proper in this district under 28 U.S.C. § 2241(d). The parties do not dispute that Petitioner has exhausted his state remedies as to all of the claims presented in this petition, nor do they dispute the timeliness of the petition.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C § 2254(d). A state court's decision is "contrary to" clearly established Supreme Court law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving materially indistinguishable facts but reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 413-14 (2000). A decision is an "unreasonable application" of Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 414.

Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. *Williams*, 529 U.S. at 412. "While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) (citation omitted).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

7

federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted). Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Because the California Supreme Court summarily denied relief, this Court looks to the California Court of Appeal's January 30, 2006 written decision denying Petitioner's appeal and request for habeas relief.

## III. DISCUSSION

### A. Jury Instructions

Petitioner first contends that he is entitled to habeas relief based on two erroneous jury instructions. As explained by the California Court of Appeal:

> The trial court instructed the jury on imperfect self-defense with CALJIC No. 5.17 as follows: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This will be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. [¶] Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter. [¶] As used in this instruction, a[n] 'imminent' peril or danger means one that is apparent, present, immediate, and must be instantly dealt with, or must so appear at the time to the slayer. [¶] However, this principle is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack, or pursuit."
>
> The final paragraph of this instruction is bracketed in CALJIC No. 5.17, and was also bracketed at the time the trial court gave this instruction. Both the prosecutor and defense counsel requested CALJIC No. 5.17, however they requested it only by instruction number and title, not by text. There is no indication in the record that either the prosecutor or defense counsel ever specifically requested the above-quoted bracketed portion of CALJIC No. 5.17 dealing with a defendant's "unlawful or wrongful conduct" ("wrongful conduct"

8

> instruction). However, they did discuss the substance of CALJIC No. 5.17 with the court in the context of defense counsel's request for a pinpoint instruction regarding the instruction's first main paragraph. Moreover, there was no objection when the court actually gave the "wrongful conduct" instruction.

Resp. Ex. 9 at 8-9 (footnote and citations omitted). Petitioner now contends that the trial court's inclusion of the last sentence of CALJIC No. 5.17 – to which Petitioner's counsel asserted no objection at trial – was erroneous.

In addition, Petitioner argues that the trial court erred when instructing the jury on malice.

> The trial court instructed the jury with CALJIC No. 8.11 that "malice is express when there is manifested an intention unlawfully to kill a human being" and malice is implied when "1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." In contrast to the definition of implied malice in CALJIC No. 8.11, Penal Code section 188 provides that malice "is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Because the CALJIC No. 8.11 definition of implied malice is easier for jurors to understand than Penal Code section 188's cryptic "abandoned and malignant heart" language, the California Supreme Court has expressly approved the CALJIC definition.
>
> Bland "acknowledges the long line of case law by the California Supreme Court determining that the 'abandoned and malignant heart' language of Penal Code section 188 is too confusing for juries." Nonetheless, Bland asserts the trial court erred in failing to instruct the jury that implied malice required that Bland acted with an abandoned and malignant heart. He argues the "abandoned and malignant heart" language of Penal Code section 188 "is not too confusing in a case where there is evidence to support imperfect self-defense voluntary manslaughter, because [this language] explains why malice does not exist when the defendant actually believed in the need to defend against imminent peril." He argues "it is more confusing to instruct a jury, in a case involving evidence of imperfect self-defense, to the effect that the elements for second degree murder and voluntary manslaughter are the same, but that somehow (as if by magic), an actual but unreasonable belief in the need to defend against imminent peril negates malice."

Resp. Ex. 9 at 26-27 (citations omitted). Petitioner's trial counsel did not object to the giving of CALJIC No. 8.11 at trial.

9

Habeas relief based on an erroneous jury instruction may be granted only if the challenged instruction "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal quotation marks and citation omitted). The challenged instruction must not be viewed in isolation; instead, the instruction "must be considered in the context of the instructions as a whole and the trial record." *Id.* When a petitioner contends that a jury instruction was ambiguous, the court must determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution," *id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)); if not, then no constitutional error occurred. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam). Moreover, Petitioner is not entitled to habeas relief unless the error at issue "had substantial and injurious effect or influence in determining the jury's verdict"; that is, Petitioner must establish that the error "resulted in actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citations omitted).

The parties dispute whether this Court can reach the merits of Petitioner's arguments given the state appellate court's conclusion that the lack of objections at trial waived the arguments or rendered them the result of invited error. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 750 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."). However, even if this Court could reach the merits, it would find no basis to grant habeas relief. First, the state appellate court reasonably concluded that there was no reasonable likelihood that the jury misunderstood CALJIC No. 5.17:

> Bland asserts "the instruction was misleading because the phrases 'created the circumstances,' 'wrongful conduct' and 'unlawful conduct' are overly broad and vague." However, the other instructions given ensured that the jury understood the meaning of these phrases.

10

> The trial court instructed the jury with CALJIC No. 5.30 (Self-Defense Against Assault), which explained a person being assaulted (e.g., Daniels) may defend himself from attack (e.g., by chasing away Bland or attempting to disarm him) if he reasonably believes "that bodily injury is about to be inflicted upon him." CALJIC No. 5.30 addresses Bland's contention that the "wrongful conduct" instruction did not adequately explain that Daniels's pursuit and attempted use of force against Bland was only "legally justified" if Daniels' [sic] had "a reasonable fear of imminent bodily harm." CALJIC No. 5.50 (Self-Defense-Assailed Person Need Not Retreat), also read to the jury, explained that a person threatened with an attack that justifies self-defense need not retreat and may pursue his assailant until he has secured himself from danger if that course appears reasonably necessary. The jury received guidance regarding when self-defense is legally justified from CALJIC Nos. 5.12 (Justifiable Homicide in Self-Defense), 5.13 (Justifiable Homicide-Lawful Defense of Self or Another), and 5.51 (Self-Defense-Actual Danger Not Necessary). Finally, if the jury concluded, for example, that Daniels's pursuit of Bland was not "legally justified" for purposes of the "wrongful conduct" instruction, the jury was also instructed with CALJIC No. 17.31 (All Instructions Not Necessarily Applicable) to disregard instructions that were factually inapplicable. Consequently, even assuming some of the language of the "wrongful conduct" instruction, in isolation, was overly broad and vague as Bland asserts, the jury was not likely misled because of the other instructions the jury received at trial.

Resp. Ex. 9 at 13-14.

Moreover, the state appellate court reasonably concluded that any error that might have resulted from the use of CALJIC No. 5.17 was harmless:

> Even if the portion of CALJIC No. 5.17 to which Bland objects had been excised from the instruction, the evidence at trial indicates there is no reasonable probability the jury would have accepted an imperfect self-defense voluntary manslaughter theory. The evidence regarding the way Bland killed Daniels indicated Bland did not have an actual but unreasonable belief in the need to defend himself from Daniels at the time he shot him 15 times. Following a chase by Daniels, whom Bland knew was unarmed, Bland shot Daniels four times in the torso, and twice in the back as Daniels fell to the ground. These six shots alone rendered Daniels immobile and unconscious within seconds, although he was still alive. Bland admitted Daniels was no longer a threat at that point. Nonetheless, Bland continued to shoot the still living Daniels nine times in the face at very close range. In order to do this with his semiautomatic rifle, Bland had to squeeze the trigger an additional nine separate times. Bland admitted he shot Daniels "too many" times.
>
> The prosecutor emphasized this evidence during his closing argument. He argued that shooting Daniels 15 times, including nine times at close range in the face, made a statement that "I'm not afraid of you, and I'm not putting up with you anymore." The prosecutor

11

> emphasized that to inflict Daniels's facial wounds, Bland had to have put the gun close to Daniels's head and squeezed the trigger nine separate times – more times than Bland shot Daniels while he was upright. Specifically with respect to imperfect self-defense, the prosecutor argued that when Daniels fell to the ground, "the danger had ended, . . . his adversary was disabled for more of those shots. His adversary was on the ground, out, and he put nine more shots into his face." Similarly, the prosecutor pointed out that even if the jury wanted to believe Bland was scared and acted in self-defense during the first six shots he fired into Daniels, Bland admitted during trial that Daniels was not a threat by the time he hit the ground. The prosecutor argued this showed Bland did not believe Daniels was a threat at the time he fired the final nine shots into Daniels's head.
>
> Moreover, evidence regarding the events leading up to the shooting also suggested Bland did not actually fear imminent bodily harm or death at the time he shot Daniels, but instead sought to provoke a conflict with Daniels creating a real or apparent necessity for self-defense. This conclusion is supported by Bland's acts of arming himself, going to a location where Daniels warned him not to go and where Bland was certain to encounter Daniels (instead of, for example, arranging with Chambers to meet somewhere else that night), and openly displaying his large and scary-looking rifle. Indeed, Chambers initially told police that the reason Bland went there that night was to "retaliate" for Daniels's pulling a gun on him the night before.
>
> The prosecutor made this same argument after the court properly instructed the jury with CALJIC No. 5.55 (Plea of Self-Defense May Not Be Contrived): "Is it really reasonable to believe . . . that the only thing going on in [Bland's head] at that point is, I was afraid. [¶] After he chose to bring the gun to that location, after he got the type of gun that he did, after he did all those things, can you really believe that he was acting under fear alone, or did he have other motives? Was he sick of being belittled? Was – did he want a corner to sell on? Did he want to say that he was tough? Was he retaliating or getting him back for what he did the night before? Was he trying to deal with his anger, stop being embarrassed? All of those things would take it out of the realm of self-defense."

Resp. Ex. 9 at 15-17 (citations omitted); *see also id.* at 17 (concluding that, for these same reasons, "it does not appear reasonably likely [that Petitioner] would have obtained a more favorable verdict had the trial court defined," sua sponte, the term "unlawful or wrongful conduct" or the "circumstances" referred to in the last sentence of CALJIC No. 5.17).

The state appellate court also reasonably concluded that there was no reasonable likelihood that the jury applied CALJIC No. 8.11 in a constitutionally deficient manner:

> "[w]e do not believe ... there is 'a reasonable likelihood' the jury" was misled by the instructions as Bland asserts, i.e., that the jury was

12

> confused about when malice is negated. The jury was instructed with CALJIC Nos. 8.50 and 5.17 that "the distinction between murder and manslaughter is that murder requires malice while manslaughter does not;" that "[w]hen the act causing the death, though unlawful, is done . . . in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, the offense is manslaughter"; and that a person who kills in such imperfect self-defense "does not harbor malice aforethought and is not guilty of murder." The jury did not submit any questions during its deliberations indicating any confusion about this or any other issue involving instructions.

*Id.* at 28 (citations omitted).

For the above reasons, Petitioner has failed to demonstrate that he is entitled to habeas relief based on claims of erroneous jury instructions.

### B. Prosecutorial Misconduct

Petitioner also claims that he is entitled to relief based on alleged misstatements of law made by the prosecutor during closing arguments. Prosecutorial misconduct violates a defendant's due process rights when it so infects the trial as to render the proceedings fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986). Factors to consider when weighing a claim of prosecutorial misconduct include: "(1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) (citing *Darden*, 477 U.S. at 181-82). Claims of prosecutorial misconduct are also subject to harmless error analysis, and habeas relief can be granted only if the petitioner can establish that the misconduct "resulted in actual prejudice." *Brecht*, 507 U.S. at 637 (internal quotation marks and citation omitted).

The state appellate court reasonably concluded that the prosecutor in this case misstated the law on only one occasion, and that this misstatement was harmless. The identified misstatement concerned implications that the jury had to find Petitioner guilty of murder and not voluntary manslaughter if it found that Petitioner "had the requisite actual belief in the need to defend himself while he fired all 15 shots, but also that there was no real danger to Bland once Daniels was on the ground." Resp. Ex. 9 at 23. The state appellate

court concluded that this was an erroneous interpretation of the law of self-defense but reasonably determined that this error was harmless:

> First, the trial court had instructed the jury with CALJIC No. 0.50 that "[i]f anything concerning the law said by the attorneys in their arguments . . . conflicts with my instructions on the law, you must follow my instructions."  Moreover, the prosecutor also told the jury toward the beginning of his argument:  "If you think that anything that I say . . . disagree[s] with the law, as the Judge gave it to you, . . . then you go with the law that the Judge gave you. [¶] My intent is in no way to mislead you, but somebody may look at something and say, That's not exactly the same.  You go with the law that the Judge gave you."  Thus, the jury was told to disregard the prosecutor's comment because that comment conflicted with one of the court's instructions (CALJIC No. 5.17) which stated that a person who kills with "the actual but unreasonable belief in the necessity" for self-defense "does not harbor malice aforethought and is not guilty of murder."  Second, we note that the prosecutor's comment was isolated and relatively brief in relation to the rest of the prosecutor's argument on imperfect self-defense.  Finally, we conclude there was no prejudice based on the same reasons we set forth in Discussion, section I.B.2.c. *ante* [repeated in this order at section III.A] regarding why there is no reasonable probability the jury would have accepted an imperfect self-defense voluntary manslaughter theory.

Resp. Ex. 9 at 24 (citations omitted).

This Court "presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).  As the Supreme Court explained:

> Cases may arise in which the risk of prejudice inhering in material put before the jury may be so great that even a limiting instruction will not adequately protect a criminal defendant's constitutional rights.  Absent such extraordinary situations, however, we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions.

*Id.* (citations omitted).  No such extraordinary circumstances are present in this case.

As to the remainder of the challenged comments by the prosecutor during closing argument, Petitioner fails to persuade the Court that any misconduct occurred.  The state appellate court reasonably determined that the arguments fell within the prosecutor's permissible latitude during argument.  For example, it was permissible for the prosecutor to argue that "(1) given the fact Daniels was incapacitated by the first six shots and (2) given

14

Bland admitted this fact, the jury could reasonably infer that Bland did not actually believe Daniels was still a threat to him when he shot Daniels an additional nine times in the face at close range." Resp. Ex. 9 at 22-23. Likewise, the prosecutor did not commit error in his closing arguments when he repeated, explained without misstating, and highlighted certain aspects of the jury instructions. *See id.* at 24-26.

In sum, only one of the challenged statements during closing arguments constituted prosecutorial misconduct, and such error was not prejudicial. Petitioner has failed to demonstrate that the state court's rulings on his prosecutorial misconduct claims were contrary to or an unreasonable application of *Darden* or other clearly established federal law.

### C. Ineffective Assistance of Counsel

Petitioner next seeks habeas relief based on several claims of ineffective assistance of counsel. The standard for such claims has been well-established since *Strickland v. Washington*, 466 U.S. 668 (1984), and was correctly described by the state court. To prevail on such a claim, a petitioner must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. The first component requires showing "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The second component requires showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

In this case, the state appellate court found that Petitioner could not satisfy the prejudice prong of *Strickland*. This Court has already found reasonable the state court's determination that Petitioner suffered no prejudice by the trial court's instructing the jury with CALJIC No. 5.17; it was likewise reasonable for the appellate court to conclude that no prejudice resulted from Petitioner's trial counsel's failure to object to the last sentence of that instruction, to request modification of the instruction, or to request a companion instruction

15

that "a person does not have any duty to curtail his activities to avoid an encounter with a person who has threatened to attack." Resp. Ex. 9 at 19. Similarly, just as the state court reasonably found any prosecutorial misconduct to be harmless, it was reasonable for the court to conclude that Petitioner's trial counsel's failure to object to the alleged misconduct caused no prejudice.

Petitioner also challenges his trial court's effectiveness concerning CALJIC No. 5.50.1.

> At defense counsel's request, the trial court instructed the jury with CALJIC No. 5.50.1, as follows: "Evidence has been presented that on a prior occasion the alleged victim threatened or assaulted or participated in an assault or threat of physical harm upon the defendant. If you find that this evidence is true, you may consider that evidence on the issues of whether the defendant actually and reasonably believed his life or physical safety was endangered at the time of the commission of the alleged crime. [¶] In addition, a person whose life or safety has been previously threatened, or assaulted by others is justified in acting more quickly and taking harsher measures for self protection from an assault by those persons, than would a person who had not received threats from or previously been assaulted by the same person or persons."
>
> Bland argues in his habeas corpus petition that CALJIC No. 5.50.1 "does not address threats or assault by third parties whom the defendant associated with the victim." Citing evidence in the record that Bland was threatened not only by Daniels, but by his associates, Bland argues defense counsel was ineffective for failing to request a pinpoint instruction regarding third-party threats or a modification of CALJIC No. 5.50.1 accordingly.

*Id.* at 28-29 (citations omitted). The state appellate court concluded that "Bland's counsel did not provide deficient performance because, as given to the jury, CALJIC No. 5.50.1 adequately addressed all of the evidence regarding threats or assaults in this case." *Id.* at 29. The court further concluded that there was no prejudice. These determinations were not unreasonable. Evidence was presented at trial that some of Daniels's associates threatened Petitioner, but the evidence also demonstrated that Daniels participated in all of these alleged threats. Thus, "even if the jury did not consider the independent acts and conduct of third parties, there likely would not have been any significant impact on the jury's deliberations." *Id.* at 30.

16

Next, Petitioner contends that his trial counsel was constitutionally inadequate because he failed to request modification of CALJIC No. 2.70, which states that "[e]vidence of an oral confession or an oral admission of the defendant not made in court should be viewed with caution." *Id.* During his videotaped interview with the police, which was played for the jury, "Bland tearfully admitted he shot Daniels, but he also explained he feared for his life at the time of the shooting because of earlier threats made by Daniels and because, just before the shooting, Daniels chased Bland and was trying to take his gun." *Id.* Petitioner contends that his trial counsel should have asked for a modification to CALJIC No. 2.70 "to state that videotaped out-of-court statements of the defendant need not be viewed with caution." *Id.* at 31. The state appellate court determined that failure to request this modification was not prejudicial:

> The jury was merely instructed to view Bland's videotaped admissions with caution, not to disregard them. Moreover, Bland provided much more detailed and coherent testimony at trial regarding the same subject matter as the videotaped police interview. As the Attorney General correctly points out, "[g]iven that the jury was able to evaluate [Bland's] demeanor on the stand, it is not reasonably likely that its verdict hinged on the reliability of [Bland's] post-arrest statement."

*Id.* This determination was not unreasonable.

In his final claim of ineffective assistance of counsel, Petitioner argues that his trial counsel should have requested redaction of a portion of Petitioner's videotaped interview in which Petitioner "admitted he had been arrested about twice and 'in handcuffs' six times." *Id.* Failure to request such a redaction, Petitioner argues, was constitutionally deficient because the "jury could easily have inferred from this testimony that petitioner had a long history of being involved in dangerous conduct, when there was no other evidence to support such a notion." *Id.* The state appellate court reasonably determined that this claimed error did not prejudice Petitioner's defense:

> As the Attorney General correctly observes, Bland's criminal conduct "was central to his claim of self-defense." Among other testimony regarding drug usage and dealing, Bland testified that Daniels threatened him because Bland was selling drugs in Daniels's territory. Testimony by Eric Chambers was to the same effect. In light of the extensive testimony regarding Bland's criminal conduct,

17

> this brief and undetailed admission during his police interview that he had been arrested and handcuffed before likely had no impact on the jury's deliberations.

*Id.* at 31-32.

In short, none of Petitioner's ineffective assistance of counsel claims has merit. Petitioner has failed to demonstrate that the state court's conclusions on these claims were in any way contrary to or an unreasonable application of *Strickland*.

### D. Cumulative Error

Finally, Petitioner contends that the cumulative prejudicial impact of all of the errors claimed above merits habeas relief. "Even if no single error were sufficiently prejudicial, where there are several substantial errors, their cumulative effect may nevertheless be so prejudicial as to require reversal." *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003) (alterations, internal quotations, and citations omitted).

> [T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense "far less persuasive," *Chambers* [*v. Mississippi*, 410 U.S. 284, 294 (1973)], and thereby had a "substantial and injurious effect or influence" on the jury's verdict, *Brecht*, 507 U.S. at 637, 113 S. Ct. 1710 (internal quotations omitted).

*Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007). In this case, there was no substantial constitutional error, let alone several such errors. Moreover, after reviewing the trial record and the strength of the government's case, the Court concludes that any errors that did occur did not, even when considered as a whole, render Petitioner's defense "far less persuasive," nor did they have a "substantial and injurious effect or influence on the jury's verdict." *Id.* (citations omitted). Consequently, Petitioner's claim based on alleged cumulative error is insufficient to warrant habeas relief.

//
//
//
//
//

**IV.  CONCLUSION**

For all of the above reasons, Petitioner has failed to show that he is entitled to habeas relief in this case. Accordingly, with good cause appearing, the petition for a writ of habeas corpus is DENIED. Because a hearing is unnecessary to resolve Petitioner's claims, Petitioner's request for an evidentiary hearing is also DENIED. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated:  09/03/10

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT